[Civ. No. 2170. Fourth Appellate District.—March 1, 1939.]

CALIDINO HOTEL COMPANY OF SAN BERNARDINO, CALIFORNIA (a Corporation), Respondent, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), Appellant.

296

Freston & Files and James A. McLaughlin for Appellant.

Guthrie & Curtis for Respondent.

GRIFFIN, J.—On March 8, 1938, appellant bank, acting as trustee under a trust indenture which was then in default, entered the premises in the city of San Bernardino known as the California Hotel. Solt, Inc., a corporation, successor of Durbin Building Corporation, was the owner of a ground lease upon the premises and was the debtor or trustor under a trust indenture dated May 1, 1925. By this trust indenture the Durbin Building Corporation conveyed, among other things, its leasehold interest in certain property in San Bernardino to Hellman Commercial Trust & Savings Bank, as trustee, for the purpose of securing its issue of $200,000 in first closed mortgage 7 per cent leasehold gold bonds. These bonds matured serially on May 1st of each of the years commencing with 1928 and ending with 1935, and bore interest at the rate of 7 per cent per annum payable semi-annually. The leasehold hypothecated as security for the bonds was evidenced by a lease from the Roman Catholic Bishop of Los Angeles and San Diego, as lessor, to R. E. Durbin and Stella K. Durbin, lessees and assignors of Durbin Building Corporation. Thereafter, and in 1931, Durbin Building Corporation, a California Corporation, caused its corporate name to be changed to Solt, Inc., by which name it has since been designated. Also, through various consolidations and mergers, all transpiring prior to 1930, the present defendant and appellant, Bank of America National Trust and Savings Association, became the successor trustee under the trust indenture. At the time of appellant's entry, $167,000 in prin-

cipal amount of the bonds was still outstanding and unpaid and all of these bonds had become due, the last of the serial maturity accruing in 1935. Likewise, interest was unpaid on these bonds since 1931. At the time of entry the respondent corporation was in possession of the premises as lessee of Solt, Inc., under a lease dated August 31, 1936.

The respondent contended that the entry had been effected with force and violence and commenced an action for forcible entry and detainer, asking for restitution of the premises and damages for wrongful detention. The appellant appeared, pleading by way of defense (1) that it had taken peaceable possession as trustee of the premises under and pursuant to the deed of trust; (2) that the respondent had consented to and acquiesced in appellant's entry; (3) that respondent was estopped to assert possession by reason of the alleged representations made in a certain 77–B (bankruptcy) proceeding before the United States District Court; (4) that Solt, Inc., and not the respondent, was in possession at the time of the entry; (5) that the action was not brought in good faith, but for the purpose of harassing the appellant; and (6) that Solt, Inc., and not the respondent, was the real party in interest.

The trial court found that while the respondent was in actual, quiet and peaceable possession, and entitled to possession of the same, the appellant, with violence and a strong hand and by force, and without the consent of respondent, entered upon and broke open and into the premises, and with force and violence removed, put out and expelled the respondent therefrom; and that the said entry was commenced on the 8th day of March, 1938, and completed on the 11th day of March, 1938; and accordingly the court gave judgment in favor of the respondent, and awarded it possession of the premises and damages in the sum of $4,000. The court further decreed that the rights of the respondent to the possession of the premises under and by virtue of the provisions of its lease with Solt, Inc., were paramount and superior to the rights of the appellant, pursuant to the trust indenture.

Appellant now contends (1) that the lease to respondent, even if respondent were actually in possession at the time of appellant's entry, was subject to and subordinate to the rights of appellant under the trust indenture; (2) that even though appellant had excluded respondent by force, the provisions of the indenture are a bar to any recovery in this

action; (3) that appellant's entry was not accomplished by the use of force or threats of force, as the same have been defined by the decisions; (4) that the trial court erred in admitting evidence which was prejudicial to appellant; (5) that the evidence conclusively shows that Solt, Inc., and not respondent, was in possession at the time of appellant's entry; and (6) that there is no proper evidence to sustain the recovery of damages awarded.

 The general rule is to the effect that a subsequent lessee of mortgaged property, taking under a lease from the mortgagor, takes subject to the mortgage. (*McDermott* v. *Burke*, 16 Cal. 580; *Nineteenth Realty Co.* v. *Diggs*, 134 Cal. App. 278 [25 Pac. (2d) 522]; *Mercantile Trust Co.* v. *Sunset etc. Co.*, 176 Cal. 458 [168 Pac. 1036]; *Schroeder* v. *Berlin Arcade Real Estate Co.*, 175 Wis. 79 [184 N. W. 542]; vol. 2, Jones on Mortgages, 8th ed., p. 367; *Dugand* v. *Magnus*, 107 Cal. App. 243 [290 Pac. 309].) Yet, where the mortgage in express terms or by clear implication authorizes the mortgagor to make such a lease for the benefit of the mortgagee, a lease made in pursuance of such authority is binding upon the mortgagee and those claiming under him. (*Sammons* v. *Kearney Power & Irr. Co.*, 77 Neb. 580 [110 N. W. 308]; 19 R. C. L. 321, sec. 97; 8 L. R. A. (N. S.) 404.)

 Considering the first and all-important point presented for consideration in the light of this general rule, it becomes necessary to examine the terms of the trust indenture. Section 7, article V, contains the following provision:

"The said company (Solt, Inc., lessor) covenants and agrees that it will use every endeavor to lease all portions of the building erected upon said premises hereinabove described and that, upon the expiration or surrender of any portion of said building, it will immediately use its best endeavors to re-let the said vacated portion of said building upon the most favorable terms and at the highest rent reasonably to be obtained."

Section 10, article V, further provides:

"The company covenants and agrees that it will well and truly keep, observe and perform any and all obligations and regulations now or hereafter imposed upon it by contract or prescribed by any law of the United States or of any state, or by any ordinance of any municipality or governmental body having jurisdiction or control thereof, or in respect

thereto, as a lawful condition to the continued enjoyment of the leases, contracts or rights now owned or held by the company, or hereafter acquired by it, to the end that such leases, contracts and rights may be maintained and preserved and may not become abandoned, forfeited or in any manner impaired; . . . ''

Sections 5 and 6 of article V provide:

''The company covenants and agrees that upon the making of any lease on any portion of the real property described in the granting clause, or of the buildings erected upon said real property, it will at once deliver to and pledge with the said trustee the said lease to be held by said trustee as a further and additional security for the payment of all of the bonds secured hereby, and the performance by the company of every term, covenant and condition imposed upon it by this indenture. . . .

''The said company further covenants and agrees that it will from time to time execute and deliver to the said trustee such further assignment or transfers, or other instruments as the trustee may, from time to time, require, to enable it, in the event of its taking possession of said property, to collect or receive all moneys, rentals or tolls, due or to grow due to the company in any manner whatsoever.''

Section 24, article V, provides for the collection of rentals as follows:

''The company covenants and agrees that it will on or before the 15th day of each month commencing on the 15th day of the month following the month in which said building is completed, pay to the Trustee all sums collected by it as rentals for any portion of the said premises since the 15th day of the preceding month. The moneys so received by the Trustee from the company shall be set apart by the trustee in a separate trust fund and shall be used by the trustee and expended by it to meet the next ensuing payment of ground rent as provided in said lease, and next ensuing installment of taxes upon the property covered hereby, and the next ensuing semi-annual installment of interest upon said bonds and the principal payment requirements as provided for in section 2 above. In the event that after the payment by the trustee of all said sums out of said rentals, there shall remain with the trustee any surplus on the first day of March, 1926, and on the termination of any quarterly period thereafter,

then the trustee shall pay over all such sums to the trustee under that certain trust indenture securing the second mortgage eight per cent leasehold serial gold bonds of the company to be used in the manner provided in said trust indenture. In the event that such rentals are so deposited with the trustee and used by it for the payment of the items hereinabove provided for, the company shall be relieved of the duty to make monthly payments to apply upon interest, principal and ground rent as required by section 20 of this article.''

Section 1, article VI, provides:

''Unless and until one or more of the events of default shall have happened as herein specified, the company shall retain possession of the trust estate and shall manage, operate and use the same and every part thereof with rights and franchises and privileges pertaining thereto and shall receive, take and use the rent, income earnings and profits thereof.''

Section 9, article V, reads:

''The company covenants and agrees that this indenture now is and always will be kept a first lien upon all property described or mentioned in the granting clause hereof, and upon all property that hereafter shall be acquired with proceeds of bonds secured hereby; . . . ''

Several grounds of default under the trust agreement may be declared. (a) In case default shall be made in the payment of interest on any bond. (b) In case default be made in the payment of any ground rent. (c) In case the company shall go or be put into bankruptcy.

Section 2, article VII, recites:

''If one or more of the events of default shall happen, then and in each and every such case the trustee, either personally or by its agents or attorneys, may in its discretion, and upon the written request of the holders of twenty-five per cent (25%) in amount of the bonds secured hereby then outstanding, and upon being tendered reasonable indemnity . . . forthwith shall enter into and upon and take and hold possession of the trust estate, and may exclude the company and its agents and servants and all other persons or corporations wholly therefrom and may use, operate, manage and control the trust estate and conduct the business of the company to the best advantage of the holders of the bonds secured hereby.

"Upon every such entry the trustee from time to time, at the expense of the trust estate, either by purchase, repair, or construction, may maintain and restore and insure and keep insured, the trust estate and make all necessary repairs, renewals, replacements, alterations, additions, betterments and improvements, as it may deem judicious. The trustee in case of such entry, shall have the right to manage the trust estate and exercise all the rights and powers of the company, either in the name of the company or otherwise, as the trustee shall deem best; and shall be entitled to collect, take and receive all tolls, earnings, income, rents. issues and profits of the trust estate."

Section 4, article VII, reads:

"If one or more of the events of default shall happen, the trustee in its discretion may, and upon the written request of the holders of twenty-five per cent (25%) in amount of the bonds secured hereby and then outstanding, and upon being tendered reasonable indemnity, *shall proceed to protect or enforce its right or rights of the bondholders under this indenture by a suit in equity or action at law, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the foreclosure of this indenture, or for the enforcement of any other appropriate legal or equitable remedy as the trustee shall deem most effectual in support of any of its rights or duties hereunder; and upon instituting such proceedings or in order to take possession as hereinbefore provided, the trustee shall be entitled to the appointment of a receiver of the trust estate and to the sale of the trust estate as an entirety, if the court in its discretion shall so order."* (Italics ours.)

Section 10, article VII:

*"Any such sale or sales shall divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of the company of, in and to the property and premises sold,* and shall be a perpetual bar, both at law and in equity, of the company, of, in and to the property and premises sold, and shall be a perpetual bar, both at law and in equity against the company, its successors and assigns, and against any part thereof, from, through or under the company, its successors or assigns." (Italics ours.)

The form of bond contains this provision: "For a description of the properties mortgaged, the nature and extent of the security, the rights of the holders of the bonds and of the Trustee in respect to such security, and the terms and conditions upon which said bonds are issued and secured, reference is made to said mortgage or deed of trust, to all of the provisions of which the holder hereof by accepting this bond, assents."

Appellant forcefully presents the argument that the lease terminated upon breach of the conditions of the trust, and accordingly claims under section 2, article VII that the trustee was automatically empowered to take possession of the hotel and to exclude the tenants and to operate the properties, and cites in support of this contention volume 2, Jones on Mortgages, eighth edition, at page 375, and the case of *Nineteenth Realty Co. v. Diggs, supra.* That case involved a bond issue for the erection of an apartment house and the plan of operation embarked upon was a contract for the leasing of the apartments for long terms. There was evidence of fraud in reference to payment of the full purchase price of the long-term leases. The leases were not then in effect but were to become operative at a date several years in the future. The tenants were claiming right of possession under a contract of purchase of a lease not fully performed, *and there had been a trustee's sale under which plaintiff took the title in fee to the entire property.* The court gave to it possession of the premises in an unlawful detainer action.

In the instant case the executed lease was for a term of ten years at a total rental of $150,000, payable $1250 per month. Respondent had occupied the hotel under the lease for a period of two years with full knowledge of the trustee. It was not in default under its lease. It was not contended at the trial that the lease was not on the most favorable terms and at the highest rent reasonably to be obtained. There was no trustee's sale under which appellant took title to the property. No element of fraud was involved and we cannot presume fraud or collusion from the record before us. (Sec. 1963, Code Civ. Proc., subd. 19.)

The cited case of *Sammons v. Kearney Power & Irr. Co., supra,* is very similar to the case at bar. In that case the Kearney Power & Irrigation Company executed and delivered a mortgage on certain of its property to secure a bond

issue, and we must assume from the import of the decision that subsequent to the execution of the mortgage the Kearney Company contracted to give to Northwestern Electric Heat & Power Company the right to take water for a period of fifteen years for a consideration. There was a default upon the bond issue, and certain bondholders brought an action to foreclose .the mortgage. The Northwestern Electric Heat & Power Company was permitted to intervene and to set up its rights under its contract with the Kearney Company, the mortgagor, whereupon the court found in favor of the bondholders upon foreclosure and ordered the sale of the property subject to the rights of the Northwestern Electric Heat & Power Company under its contract. Upon appeal, the Nebraska Supreme Court said:

"The plaintiff assigns several errors, but they all turn on the single question: Did the court err in providing in the decree that the sale thereunder should be subject to the rights of the intervening company under its contract with the mortgagor? The plaintiff invokes the general rule to the effect that, where a corporation mortgages its property, the mortgagee is not bound by subsequent contracts of the mortgagor with respect thereto, whether such contracts are leases, sales, mortgages, or otherwise. (Citing cases.) The foregoing rule is easily recognizable, as it is grounded on the general rule, applicable to all mortgages, that an interest subsequently acquired by a third party in the mortgaged property is subject to the mortgage; but the question is whether the facts in this case bring it within that rule. It will be conceded, notwithstanding the positive language in which such rule is stated, that it would be competent for the parties to a mortgage to take it out of the operation thereof by express stipulation; that is to say, that in case the mortgage should expressly provide that the mortgagor should be authorized to lease the property, or portions thereof, or enter into contracts with respect thereto, and that such leases and contracts, when made, should pass to the mortgagee as further security for the mortgage debt, leases and contracts made by the mortgagor in the exercise of such authority would be valid and binding as against the mortgagee and those claiming under him. It will also be conceded that the same result would follow, whether such authority rest on express grant or clear implication. Hence, in order to determine whether the mort-

gagor had authority under the mortgage to make the contract or lease under which the intervening company claims, an examination of the provision of the mortgage becomes necessary. It is not claimed that such authority is expressly given. It remains to determine whether it is given by implication. The solution of this question is to be found, we think, in the familiar rules of construction applicable to the facts in this case, rather than in precedents resting, as they must, on instruments differing materially from that under consideration.''

However, the holding in that case was differentiated in the case of *Schroeder* v. *Berlin Arcade Real Estate Co.*, *supra*. We are impelled to conclude that by the provisions of the trust indenture above quoted and the circumstances of this case, the trial court was justified in finding that the appellant and bondholders consented to and authorized the leasing of the premises on the most favorable terms and at the highest rent reasonably to be obtained. The leasing of the property was for the protection of the bondholders, as anticipated in the trust indenture. The parties must have contemplated that no one would care to enter into a lease of such premises as a hotel wherein the investment of considerable money would be required and wherein the success of the undertaking depended upon a long term plan of operation and the good will which was in this way created, unless such lessee had had some guarantee from the bondholders that he would not be disturbed provided he performed according to the terms of his lease. This case, we believe, falls within the rule laid down in the Sammons case.

When the construction given an instrument by a trial court appears to be reasonable and consistent with the intent of the parties, appellate courts will not substitute another interpretation, although it seems equally tenable. (*Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576, at p. 582 [300 Pac. 34].)

In considering the second point presented, appellant urges that by the terms of article VII, section 2 of the indenture, the trustee was authorized to take possession of the premises upon default, exclude the tenant, and operate the properties, and that this provision in the indenture was a complete defense to respondent's action of forcible entry, citing *Mines* v. *Superior Court*, 216 Cal. 776 [16 Pac. (2d) 732]; *American Securities Co.* v. *Van Loben Sels*, 13 Cal.

App. (2d) 265 [56 Pac. (2d) 1247]; *American Securities Co.* v. *Van Loben Sels,* 218 Cal. 662 [24 Pac. (2d) 499]; *Templar Min. Co.* v. *Williams,* 23 Cal. App. (2d) 45 [72 Pac. (2d) 566].

Assuming the correctness of our interpretation of the first point discussed, respondents, in addition to having the right of possession, were peaceably in the actual possession of the property entered. This peaceable possession, in addition to showing the forcible entry complained of, would be the only necessary showing required of the plaintiff in a forcible entry action. (Code Civ. Proc., sec. 1172.)

In the case of *California Products, Inc.,* v. *Mitchell,* 52 Cal. App. 312 [198 Pac. 646], it was held that in an action of forcible entry, it is necessary for the plaintiff to show, only, in addition to the forcible entry, that at the time of the entry he was peaceably in the actual possession of the property entered, and therefore questions of title and right of possession cannot be litigated. Also, that the lessors of demised premises are not entitled to take possession by forcible entry under a provision of a lease that provided in case the rent was not paid it should be lawful for them "without previous notice or demand, to reenter the demised premises and the same peacefully to hold and enjoy thenceforth as though this lease had not been made."

We see nothing in article VII, section 2 of the indenture that gave appellant leave to enter the demised premises in defiance of the salutary statutes against forcible entries. Considering the nature of the provisions of the statutes on the subject and the decisions construing them, some of which have been cited above, the instrument must contain most direct and positive language in order to amount to a consent by a tenant that his possession may be invaded by a forcible entry. Such a consent would place him at the mercy of his landlord. Forcible entries, made in the best of faith, may easily lead to brawls, affrays, and breaches of the peace. We are aware of the rule that where there are contractual relations between the parties involving the right to possession of the premises upon default, the lessor under the contract may take possession if it can be done peaceably. (*Francis* v. *West Virginia Oil Co.,* 174 Cal. 168 [162 Pac. 394].)

In *Baxley* v. *Western Loan & Bldg. Co.,* 135 Cal. App. 426 [27 Pac. (2d) 387], the court makes a distinction between

cases in which force was used to complete the entry and where force was used to retain possession after it had been peaceably acquired. However, in *Kerr* v. *O'Keefe,* 138 Cal. 415 [71 Pac. 447, 450], the court said: "To make a case under the pleadings, it was not necessary to prove that the entry was in fact by force and threats. The intention of the statute was to meet just such a case as this, where the entry is accomplished without force, but is retained, and the rightful owner or person entitled to possession is driven off or excluded by force and violence." To the same effect is *Templar Min. Co.* v. *Williams, supra.* So far as we have been advised, this rule has not been modified.

The authorities amply support the rule that where a right to take possession is given to a mortgagee in a mortgage or is reserved to a seller in a contract of sale or to a lessor in a lease, such right to possession may be exercised only where it can be exercised peaceably and without force or violence. If such right cannot be exercised without force or violence, the possessor of such right must resort to a court of law.

In *McDermott* v. *Burke,* 16 Cal. 580, at page 586, it was stated: "It is not contended that a mortgagor in this state cannot lease mortgaged premises. He can do so even after default in payment, and his lessee cannot be treated as a trespasser by the mortgagee until foreclosure sale and conveyance. . . . The interest of a lessee in possession under a lease made subsequent to the mortgage, is extinguished by the foreclosure and sale."

■ This question then presents itself. Was there sufficient evidence to support the finding that the entry was accomplished by the use of force? Appellant contends that the evidence would support only a finding that the entry was peaceful and quiescent.

The record, tersely related, discloses that on March 8, 1938, Mr. Tripp, an attorney representing certain holders of first bonds and a group of men representing the appellant, entered the California Hotel. A Mr. R. M. Thomason testified that there were present fourteen men in all. The group included Mr. McLaughlin, one of the attorneys for the bank; Mr. A. J. Robillard, trust officer of appellant bank; Mr. John A. De Long, who was to be the new manager of the hotel; Mr. Duni, an investigator; a Mr. Cunningham and his son, two deputy sheriffs and others. Mr. Thomason was in possession and

operating the hotel as president and manager. At least three of the men who entered the hotel approached Mr. Thomason in the coffee shop and one of them said: "We are taking possession of the hotel . . . for the Bank of America." In order to avoid an unpleasant scene, the parties adjourned to a room in the hotel where there ensued a discussion contemplated to bring about an amicable settlement. These negotiations failed. Mr. T. F. Brioady, presumably respondent's agent, testified that he noticed five or six men seated in the lobby; that they appeared very nervous; that they arose and followed him upstairs, rushed in the office behind him and one of them said: "We are taking possession of the hotel. Give us the key and the contents of the safe." Mr. Brioady said: "What order—have you got a court order?" They then threw a piece of paper toward him. He read the paper and found it was not a court order but was a letter from the bank outlining its rights. Thomason sought to maintain possession and operate the hotel by instructing all employees to disregard the trespassers and to take orders from only himself and Mr. Brioady. On numerous occasions in the interim between the entry and the time the possession of the appellant became complete, representatives of both appellant and respondent took cash from cash registers used in connection with the business operations of the hotel. Mr. Brioady collected cash as late as March 10th. Appellant's agents went to various departments in the hotel collecting money from cash registers and persuading employees to follow their instructions upon the representation that they were officers and that they were so empowered by a court order. On Thursday, March 10th, one of the appellant's agents grabbed the bartender employed by respondent and forcibly ejected him from the building, saying, "Don't ever come in here again. If you do, you won't be able to walk out." On one occasion, on the 9th day of March, Mr. Cunningham, one of appellant's agents, engaged in a scramble or scuffle with Mr. Brioady and Mr. Linfesty, both employees of respondent, in an attempt to obtain keys to one of the cash registers, and, although all three persons had their hands on the keys, Mr. Cunningham grabbed and jerked them from the hands of the other two persons. The undisputed testimony of the janitor was to the effect that pursuant to instructions which he received from appellant's representatives, he cut the lock on the liquor cup-

board with a hacksaw and replaced it with a lock belonging to the appellant. Although it does not appear that appellant's agents flourished arms, it does appear that two of them were armed. Mr. Grantham, called as a witness for respondent, testified that on the 9th of March he saw Mr. Cunningham take a blackjack out of his pocket and slip it to his son. Mr. Linfesty also testified that he saw a holster with a gun in it on Mr. Doolin when the latter took off his coat and vest and changed his suspenders. On March 10th Mr. Cunningham and Mr. Brioady had a conversation in which Mr. Cunningham threatened to use such force as might be necessary to complete possession in the appellant bank. Mr. Brioady relates the conversation as follows:

"Mr. Cunningham stated that I had an uphill battle, that if I still resisted, that they would have two men follow me wherever I went; in fact, about that time they were following me around the different parts of the building. He said, 'If you bring men in to throw us out, we will bring in twenty men; if necessary we will bring in 100 men to gain possession of the hotel.' "

Shortly after midnight on March 10th or early in the morning of March 11th, Mr. Thomason was forcibly ejected from the hotel after a controversy with Mr. Cunningham. His testimony is as follows: " . . . and I said, 'It is senseless to stand here and argue about this house; if you (Cunningham) are going to put me out, put me out. If not, I am going upstairs and go to bed.' . . . He said, 'You are going out,' and he called the other man to come over and help him, and he grabbed me under the arm and shoved me across the lobby and out the front door."

The evidence pertaining to the two men being armed was received over the strenuous objection of appellant and error is claimed for this ruling of the court. While the evidence does not indicate that the agents of appellant flaunted or flourished any arms or weapons, the testimony in reference to the possession of arms and weapons was admissible as a circumstance from which the court could reasonably infer that the agents had the ability to use force in carrying out the general threat of gaining possession and that the weapons could have been used if necessary.

The invasion consisted of a number of incidents commencing on the 8th day of March, 1938, and ceasing with

the forcible ejection of Mr. Thomason early in the morning of March 11, 1938. The record of all of these incidents has been fully considered and examined. ██ Angry words and threats of force may be, in and of themselves, sufficient to constitute acts of forcible entry. (*Gray* v. *Collins,* 42 Cal. 152; *O'Callaghan* v. *Booth & Deal,* 6 Cal. 63; *Pacific States Auxiliary Corp.* v. *Farris,* 118 Cal. App. 522 [5 Pac. (2d) 452].) The breaking of locks is of itself evidence of force. (*Saferian* v. *Baer,* 105 Cal. App. 238 [287 Pac. 142]; *Rutledge* v. *Barger,* 82 Cal. App. 356 [255 Pac. 537].)

It therefore appears to us from a study of the entire record that the evidence is more than ordinarily replete with circumstances indicative of force which overshadow the argument that the entry was of that peaceable character which the law permits an authorized possessor to make, and impels the ultimate conclusion that appellant, under the circumstances, was guilty of forcible entry; that the terms of the indenture as to possession were no defense, and that the findings inveighed against are supported by the evidence.

██ Appellant next contends that the evidence shows that Solt, Inc., and not the respondent, was in the possession of the property at the time of the entry and that respondent is estopped from claiming otherwise in view of the proceedings under section 77–B of the Bankruptcy Act in the United States District Court. It is true that on March 12, 1937, Solt, Inc., by R. M. Thomason, president, filed in the District Court of the United States a petition entitled: "In Proceedings for the Reorganization of a Corporation Under Section 77–B, Bankruptcy Act," wherein it obtained an order effective January 1, 1938, appointing Thomas F. Brioady as sole and exclusive manager of the property and estate of Solt, Inc., including the California Hotel. After several proceedings were had, on February 23, 1938, that court made an order dismissing all of the proceedings but retained jurisdiction "through T. F. Brioady, as manager, over receipts, cash on hand, and deposits in bank", etc.

The issue of possession cannot have become *res judicata* by any judgment entered in the 77–B proceedings, for those proceedings did not involve the same parties nor the same issues. Apparently the estoppel upon which appellant relies is an estoppel *in pais* or an estoppel by act or representa-

tion. The first essential under this rule would be a showing that respondent made some declaration, acted, or failed to act, by reason of which some representation was made with respect to possession. The record does not disclose such a showing.

The petition recites: "The debtor (Solt, Inc.) is engaged in a business as lessee of that certain hotel, apartment and store building known as 'The California Hotel' and the conduct of enterprises incidental thereto . . . The debtor corporation is the lessee of the entire premises under the long term ground lease." Although there appear to be some inconsistencies as to the various representations made, the trial court's finding on the defense of estoppel cannot be said to be erroneous.

Finally, we approach the remaining and important question of damages. Appellant vehemently maintains that the finding of fact to the effect that respondent was damaged in the sum of $4,000 and the judgment for recovery of that amount is not sustained by the evidence. While it does not appear what elements the court considered in ascertaining the amount of damages, there is evidence that the loss of profits from the period of entry until the time of trial would be $200 per day. This, in itself, would amount to $4,200. Loss of prospective profits under the circumstances here related are allowable. (*Landon* v. *Hill,* 136 Cal. App. 560 [29 Pac. (2d) 281].)

In addition to the above testimony and after relating in particular the reasons for his opinion, Mr. Brioady testified that the net profit resulting from the operation of the hotel property for the same period, i. e., March 8th to March 31st, would be between $5,000 and $6,000. There is evidence that the rent for this entire period had been paid by respondent. Mr. Thomason testified over objection that the business was damaged in the sum of $20,000 to $25,000, in addition to the other items of damage hereinabove mentioned. There is sufficient competent evidence to support the judgment in the sum of $4,000.

In the light of the reasons herein expressed, the judgment of the trial court is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 31, 1939, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 27, 1939.